## Ludwig v. Osterland

*Rex F. Brien,* for plaintiff.
*Jeffrey B. Rettig,* for defendant.

DOWLING, *J.,* June 28, 1989 — The genesis of the instant action was an accident involving a dump truck owned by defendant, Carlisle Hauling Co., and driven by plaintiff, David Ludwig, and a Conrail freight train at a railroad crossing in Hummelstown. As a result of the accident, Ludwig sustained various injuries, including four broken ribs and a collapsed lung, and was confined to a hospital for six days. Defendant Osterland is the principal owner and chief executive officer of Osterland Truck Services Inc., which had serviced and repaired plaintiff's truck just prior to the accident. Both corporate entities operate under the same roof. The complaint alleged that plaintiff's brakes failed, causing his truck to go onto the railroad tracks and to be struck by a

passing train, and that the named defendants[1] were negligent in failing to adequately repair the brakes on the dump truck.

The principal factual issue at trial was whether the dump truck was on the railroad tracks due to a failure of the braking system or as a result of plaintiff's negligent operation of the vehicle. Plaintiff introduced evidence demonstrating a history of brake problems with the truck which were not addressed by defendants despite complaints by Ludwig. The mechanic for Carlisle Hauling Company and a fellow driver both testified concerning Ludwig's complaints about not being able to bring the truck to a stop. Just prior to the accident, Ludwig was making deliveries to New Jersey and claimed the brakes on his truck had deteriorated rapidly. A driver for another company, who was assisting in the shipments to New Jersey, testified that he would have to radio back to plaintiff to warn him about upcoming traffic signals because Ludwig was having difficulty stopping his truck. This driver also testified that he saw a list of complaints written up by plaintiff, which included notation of brake problems, pinned up in defendants' garage on the day of the accident.

Defendants responded by admitting that there were complaints about the truck's brakes in 1985 and January 1986, but the truck was out of service due to a major overhaul during February and most of March 1986. Job tickets prepared by the drivers indicated that the truck was returned to service a

1. The complaint against defendant Carlisle Hauling Co. was discontinued because the Pennsylvania Workmen's Compensation Act, 77 P.S. 481(a), provides the exclusive remedy from an employer for personal injuries suffered by an employee while acting within the scope of his employment. *Poyser v. Newman & Co. Inc.*, 514 Pa. 32, 522 A.2d 548 (1987).

week before the accident with no indication of brake problems. Plaintiff used the subject truck on March 25, 26 and for several trips on the morning of the accident; he made no complaints regarding the functioning of the brakes. Defendant Gary Osterland and Joseph Farrell, an employee of Osterland Truck Services, testified that they saw Mr. Ludwig in the hospital on the afternoon of the accident and again at their place of business following his discharge from the hospital and on neither occasion did plaintiff mention brake failure as the cause of the accident. In addition, defendants called Officer Crandall of the Hummelstown Police Department as a witness. He took a recorded statement from Mr. Ludwig four days after the accident in which Ludwig described in some detail how he had nosed the truck out onto the first set of tracks, stopped to determine if there was a train on the second set of tracks, and was struck by the train. Crandall's testimony clearly contradicted plaintiff's version of how the accident occurred.

Following a jury verdict exonerating defendant Gary Osterland from liability and finding plaintiff 70-percent negligent and defendant Osterland Truck Services Inc. 30-percent negligent, plaintiff's counsel filed a motion for a new trial. The sole issue[2] presented in the post-trial motion is whether the court erred in admitting the statements plaintiff made to Officer Crandall, Gary Osterland, and Joseph Farrell while he was confined to the hospital.

Plaintiff filed a motion in limine attempting to preclude the admission of this testimony at trial.

---

2. The post-trial motion also contained a boilerplate allegation that the verdict was against the weight of the evidence. This issue was not addressed in plaintiff's brief and is deemed waived.

The basis of the motion and objections was 42 Pa.C.S. §7101 which provides in pertinent part as follows:

"§7101. *Settlement and other agreements with hospitalized persons* —

"(a) *General rule* —

"(1) No person whose interest is or may be adverse to a person injured who is confined to a hospital or sanitarium as a patient shall, within 15 days after the date of the occurrence causing the injury to such patient:

"(i) Negotiate or attempt to negotiate a settlement with such patient.

"(ii) Obtain or attempt to obtain a general release of liability from such patient.

"(iii) Obtain or attempt to obtain any statement either written or oral, from such patient for use in negotiating a settlement or obtaining a release.

"(2) Any settlement agreement entered into, any general release of liability or any written or oral statement made by any person who is confined in a hospital or sanitarium after he incurs a personal injury, which is not obtained in accordance with the provisions of subsection (b) shall not be admissible in evidence in any matter relating to the injury and shall not be utilized for any purpose in any matter in connection therewith . . .

"(b) *Exception* — Subsection (a) shall not apply if at least five days prior to obtaining the settlement, release, statement or contingent fee agreement, the injured person has signified in writing, by a statement acknowledged before a notary public who has no interest adverse to the injured person, his willingness that a settlement, release statement or contingent fee agreement be given or entered into." Act of July 9, 1976, P.L. 586, effective June 27, 1978.

Plaintiff contends these statements, made while he was confined to the hospital, were inadmissible and highly prejudicial and their introduction as evidence at trial constitutes a manifest abuse of discretion or a clear error of law which entitles him to a new trial. We are unpersuaded.

Officer Crandall was assigned to investigate the accident and in that capacity he interviewed Mr. Ludwig at Hershey Medical Center on March 31, 1986, four days after the collision. Crandall testified as follows:

Q: Did [plaintiff] at any time in your interview, your discussion with him did he at any time say that he had any problems with his brakes?

A: No, sir, he did not.

Q: Did he at any time say that he had been trying to stop the dump truck before he got to the crossing but that his brakes failed him and that's why he ended up on the tracks?

A: No, sir.

Q: Did he seem when you were discussing the actual happening of the accident that he was able to recall what he had done?

A: Up to the point of the accident, yes, up to the point of impact.

Q: Were you satisfied in your interview with him that you had given him the opportunity to give as full explanation as he could how the accident happened as far as he thought?

A: Yes, sir.

Q: Now, in your discussions with Mr. Ludwig, did you mention that there were violations of the Vehicle Code involved?

A: Yes, sir, I did.

Q: Do you have enough to charge him with a violation?

A: I believe so.

Q: Why didn't you?

A: I didn't see adding insult to injury. To me there was no point in it.

Q: And your testimony about Mr. Ludwig not mentioning anything to you at all about his brakes, is that based on your listening to this tape recording of the interview?

A: Yes.

Q: And is it based on your recollection of the discussions with Mr. Ludwig on March 31, 1986?

A: Yes, sir, it is.

With regard to the interview conducted by Officer Crandall, plaintiff testified that he remembered seeing someone in uniform while in the hospital, but he thought it might have been a Conrail official. Ludwig stated, "I remember somebody. I thought he was representing Conrail. But that was — I was sound asleep, and I was startled. And I don't know what I said, who I said it to, or anything else. And the next thing I know, I'm out of it again." Plaintiff also claimed at trial that his condition and the medication made him extremely groggy, confused and dazed during his six-day stay in the hospital.

Plaintiff contends that the purpose of 42 Pa.C.S. §7101(a)(1) was to protect ill or injured hospitalized persons, who may be confused, in pain, or under medication, by prohibiting any one with an adverse or potentially adverse interest from negotiating a settlement or obtaining a release within 15 days of the date of the injury. Plaintiff construes section 7101(a)(2) as an explicit and unambiguous proscription against the use of any written or oral statement, not only those "for use in negotiating a settlement or obtaining a release," made by a hospitalized person as evidence at a civil trial unless the procedural safeguards of section 7101(b) are employed.

The gravamen of plaintiff's argument is that subsections (a)(1) and (a)(2) are not interdependent, but rather should be read as independent and free-standing expressions of legislative intent. Under plaintiff's reasoning, the focus of the exclusionary rule of 7101(a)(2) is on the condition of the injured, hospitalized person and his/her ability to make cognizant decisions and not upon the interest of the party eliciting the statement nor the purpose for which it was elicited.

To bolster his interpretation of the statute, plaintiff quotes dicta from a criminal case in which a confession by a hospitalized defendant was suppressed:

"The legislature has recognized in another context that statements made by injured persons in a hospital setting raise very serious questions as to whether such statement should be recognized as valid by the law. The Act of June 9, 1972, P.L. 359, 12 P.S. §1630, et seq., prohibits the use of either written or oral statements for the purposes of civil litigation when they are obtained in a hospital from an injured patient within 15 days of the occurrence causing the injury. In fact, statements obtained from a patient in a hospital may be legally recognized only if five days prior to the giving of the statement the injured patient has signified by a notarized writing a willingness to give the statement. Although the Act of 1972 is not applicable in criminal cases and is thus not controlling in the matter before us, it clearly indicates recognition that decisions made by injured persons in a hospital setting must be considered extremely suspect." *Commonwealth v. Perry,* 475 Pa. 1, 6, 379 A.2d 545, 547 (1977).

Plaintiff also resorts to the general rules of statutory construction and maintains that where there is

a change in language in separate provisions of a statute it is prima facie evidence of a change of intent. *Commonwealth v. Bigelow*, 484 Pa. 476, 399 A.2d 392 (1979), citing *Novicki v. O'Nara*, 280 Pa. 411, 124 Atl. 672 (1924). Finally, plaintiff contends that a court may not ignore the implication of the deletion of the limiting verbiage "for use in negotiating a settlement or obtaining a release," nor disregard the clear, unambiguous language of section 7101(a)(2) on the pretext that its literal interpretation will frustrate its spirit. See generally, *Yanushko v. Commonwealth of Pennsylvania, Department of Public Welfare*, 117 Pa. Commw. 535, 534 A.2d 1277 (1988).

The Superior Court has recently addressed this issue of the interplay between section 7101(a)(1) and (a)(2) in the context of a motor vehicle accident.[3] In *Walker v. General Motors Corp.*, 383 Pa. Super. 400, 557 A.2d 1 (1989), the plaintiff was operating his car in Fairmount Park, a section of Philadelphia, when he was unable to negotiate a curve, crashed head-on to a tree, and sustained serious and permanent injuries. Plaintiff sued the manufacturer and the dealership under strict liability based on alleged defect in the braking system. Following a defendant's verdict, Walker appealed claiming the trial court erred in admitting his statement to the investigating police officer in the emergency room of the hospital shortly after the accident. Walker informed the officer that he had probably "skidded on some wet leaves" and was issued a speeding citation.

On appeal, Walker argued that his statement to

---

3. Another Superior Court panel had previously ruled that section 7101 is an unconstitutional infringement on the exclusive power of the Supreme Court to regulate and discipline attorneys. *Lloyd v. Fishinger*, 380 Pa. Super. 507, 552 A.2d 303 (1989).

the police in the emergency room was inadmissible under section 7101(a)(2). The court disagreed and ruled:

"Section 7101(a)(2) is ... inapplicable to the statement. The purpose of the statute is to prevent the exploitation of an injured person's weakened condition by a potentially adverse party in future litigation. As both the title of this section and the language of the provision indicate, the statute has to do with settlement, releases, and other agreements in contemplation of legal action. Appellant's statement was not made in the context of such action, or to a person able to become involved as a party to such action.

"While it may be argued that the phrase 'or other statement written or oral' refers without limitation to appellant's utterance, it must be read in pari materia with the remaining portions of the act. Such a reading leads to the conclusion that the failure to include language similar to that of section 7101(a)(1)(iii), e.g. 'for use in negotiating a settlement or obtaining a release,' is merely legislative oversight, the intention being to prevent a detriment to an injured person through rapacious actions by, e.g., insurance adjusters. Therefore, the trial court's refusal to exclude appellant's statement does not constitute error." *Walker, supra.* (footnote omitted)

The court also concluded that section 7101(a)(1)(iii) was not germane to the statement made to the officer even though the police report could have been used by an insurance carrier to force a settlement or to obtain a release from liability.

The court noted:

"[A] police officer's issuance of a traffic citation does not constitute proof of an interest, adverse or otherwise, since no advantage, no gain or loss,

accrues to the officer from his action, and appellant does not supply us with authority to the contrary. Moreover, the possibility that the officer's report might be used by an insurance company does not bring appellant's statement within the ambit of the statute which clearly specifies that the statement must be taken 'for use' in reaching a settlement or release." *Id.*

The court's holding, that a statement made to a police officer during the first 15 days of confinement in the hospital is beyond the purview of the statute, is supported by the legislative history of the Act of June 9, 1972, P.L. 359, §1 (which was re-enacted as part of the Judicial Code, 42 Pa.C.S. §7101, Act of July 9, 1976, P.L. 586, §2, see source notes in the Legislative Journal-House, June 26, 1976, at 5853, 5860). During floor debate on the second consideration of the bill, the principal sponsor of the legislation, Senator Coppersmith, was specifically asked whether the statute would apply to statements made to investigating officers acting in the scope of their employment.

"*Mr. Ammermen:* Mr. President, would the gentleman from Cambria [County] please advise me as to what effect Senate Bill no. 851 would have on a police officer getting a statement?

"*Mr. Coppersmith:* Mr. President, the effect of the bill would be none, because it applies to a person whose interest is, or may become, adverse to a person injured. In my opinion, a police officer, investigating a crime or an accident, would not have an adverse interest." Legislative Journal — Senate, July 20, 1971, at 562-3.

The Commonwealth Court has also recognized the limited applicability of the statute:

"Section 7101 of the Judicial Code provides that the statements which are inadmissible as evidence

are those taken while an injured person is confined to a hospital and taken for the purpose of negotiating a settlement or obtaining a release." *Anderson v. Workmen's Compensation Board,* 51 Pa. Commw. 582, 585, 414 A.2d 774, 776 (1980).

When, as here, the words of a statute are not free from all ambiguity, the intention of the legislature may be divined by examining the occasion and necessity for the statute, the circumstances under which it was enacted, the mischief to be remedied, contemporaneous legislative history, and other considerations. 1 Pa.C.S. 1921(c)(1), (2), (3) and (7).

Additionally, in determining legislative intent, sections of a statute must be read together and construed with reference to the entire statute. *Wilson v. Central Penn Industries Inc.,* 306 Pa. Super. 146, 452 A.2d 257 (1982), and sections of a statute must be construed with reference to the entire statute and not from their context. *Snyder v. Commonwealth of Pennsylvania, Department of Transportation,* 64 Pa. Commw. 599, 441 A.2d 494 (1982).

The legislative history of the precursor to section 7101 demonstrates that the legislature's intent was to proscribe the practice of unscrupulous insurance adjusters, attorneys, or other representatives of accused tort-feasors obtaining unfair advantage of hospitalized persons for the purposes of settlement.

"*Mr. Hill:* Mr. President, Senate Bill no. 581 prohibits anyone, representing a possible defendant in an accident case, from going into the hospital and getting a statement, or negotiating a release, within 15 days of the accident.

. . .

"*Mr. Bell:* Mr. President, at the expense [sic] of seeming naive, I thought that Senate Bill no. 851

would restrict the present practice of defense counsel and insurance adjusters going in and getting quick releases . . . The bill endeavors to protect someone in the hospital from being approached by an adjuster, an attorney, or an agent of an attorney, whose interest is adverse to that of the person lying in a hospital bed.

. . .

"*Mr. Hill:* This bill has to do with someone who is basically adverse to the person in the hospital, such as an insurance adjuster, or a lawyer who might represent someone or some company who was the other party to the accident . . . It merely says that if you go in and you represent an interest which is adverse to the person who is in the hospital, then a release or a statement you get from that person is not binding if you get it within 15 days. That is all the bill says.

. . .

"*Mr. Zemprelli:* First of all, hospitals are operated for the recovery of their patients, and those patients are not supposed to be badgered by attorneys classified as 'ambulance chasers' or adjusters from insurance companies who would go in and talk with parties when they are short of the information which is necessary if they are to make an independent judgment and waive away substantive rights relative to claims that they may have.

. . .

"*Mr. Duffield* [a co-sponsor of the bill]: In my opinion, as a practical, practicing lawyer, I find that it is needed, and I deplore the attitude taken in the

past of these adjusters going in and getting releases and statements from people." Legislative Journal — Senate, July 20, 1971, at 560-2.

The statute must be read in its entirety. Subsection (a)(1) limits the language of subsection (a)(2) so that the exclusionary rule is applicable only to statements obtained by persons with adverse interests who took the statement for the purpose of negotiating a settlement or obtaining a release. Officer Crandall was not a person with adverse interests or potentially adverse interests and his purpose in taking plaintiff's statement was to complete an official investigation and not to force a settlement or obtain a release. The credibility of the conflicting testimony as to Ludwig's condition at the time of the interview was a factual issue which the jury resolved in favor of defendants.

Defendant, Gary Osterland, and his employee, Joseph Farrell, on the other hand, were persons with an interest adverse to plaintiff, so we must explore their intentions in visiting Ludwig in the hospital shortly after the accident.

Farrell testified that he visited plaintiff in the hospital because he "was concerned about him." This is not an instance where an employer or his agent or an adjuster from an insurance carrier went to a hospital room to ferret out exculpatory information to minimize their liability, to effectuate a settlement or a release, or to prepare a defense to a Workmen's Compensation claim. Osterland and Farrell both testified that the first time they were cognizant of Ludwig's claim that brake failure caused the accident was after the service of plaintiff's complaint nearly 13 months after the accident.

Gary Osterland testified as follows:

Q: After you were at the accident scene on March 27, 1986, did you then go to the hospital?

A: Yes.

Q: Why?

A: To see how David was doing.

Q: Did you see him at the hospital?

A: Yes, I did.

Q: And did you discuss with him anything at the hospital?

A: Yes.

Q: What did you discuss?

A: Well, I went into his room and he was kind of laying on the bed but kind of propped up a little. I guess they were concerned about his lungs. And we had a brief chat, maybe five minutes.

Basically he was feeling very emotional and very sorrowful. And he said to me, "I'm sorry, Gary; I'm sorry. I just wasn't paying attention. I looked up. The train was 30 feet away, and I could not stop." He said, "I jammed the brakes, went for reverse and that was it." He only had seconds to react from when he saw the train.

Q: Did he say anything to you at that time that the brakes failed him?

A: Absolutely not.

. . .

A: Approximately 10 days after he got out of the hospital, David came to visit with Joe and I. It was like a sit-down critique of how he was doing and what happened and just a little update.

Q: Did you talk to him about the accident at that time?

A: We did.

Q: Was any mention made at that time by David Ludwig that the reason the dump truck was on the railroad tracks was because his brakes failed?

A: Absolutely not.

Q: And we understand that in December of '86 when David Ludwig came back to work for Carlisle Hauling Company for a couple of weeks?

A: Correct.

Q: Any discussion with him during that period of time about brake failure being the cause of the accident on March 27, 1986?

A: No, none whatsoever. The first and only notice I ever got from anybody about brake failure to that truck was the day I received the suit of judgment against me which was the beginning of April of — 13 months after the wreck.

Clearly, the exclusionary rule of section 7101(a)(2) does not apply to gratuitous statements made by an injured employee to his employer or a fellow employee during a courtesy visit at the hospital. To exclude a plaintiff's statement under these circumstances would invite and immunize perjury by duplicitous plaintiffs since the defendants would be prevented from introducing the plaintiff's hospital utterances to demonstrate prior inconsistencies or to establish the recent fabrication of testimony for the purposes of trial. When he took the stand, plaintiff put his credibility at issue and defendants effectively rebutted his version of the accident with his prior admissions.

The statements made by Ludwig to Officer Crandall, Mr. Farrell and Gary Osterland were not subject to the exclusionary rule of section 7101(a)(2) and were properly admitted at trial. Plaintiff's issue on appeal must fail.

Accordingly, we enter the following

## ORDER

And now, June 28, 1989, plaintiff's motion for a new trial is denied.